UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
        v.                      )  CRIMINAL ACTION NO. 09-10005-PBS
                                )
RONALD CAIRNIE,                 )
                                )
            Defendant.          )
_____ )

**MEMORANDUM AND ORDER**

January 19, 2010

SARIS, U.S.D.J.

## I.  INTRODUCTION

Defendant Ronald Cairnie, charged with drug trafficking,
moves to suppress evidence found during the search of his green
2001 Audi as the fruit of an illegal arrest.  After an
evidentiary hearing, the motion is **DENIED**, as there was probable
cause to arrest.

## II.  FACTS

On September 18, 2008, during an undercover cocaine
investigation, Peabody Police Sergeant Scott Richards telephoned
co-defendant Hector O'Brien, who wanted to purchase Oxycodone.
They arranged to meet on September 19 at the Carriage House Motel
on Newbury Street, Peabody, Massachusetts.  Prior to the meeting,
O'Brien told Richards that he was in Room 74, he was alone, and
he had the money for the Oxycodone pills.

Upon arriving at the motel, accompanied by a team of police

officers, Richards noticed that the door to Room 74 was wide open
and that a green Audi A6 with Maine registration was parked
directly in front of it.  A man later identified as co-defendant
Earl Hart was just outside the room, joined shortly by co-
defendant James Lee, who came out of the room.  O'Brien called
Richards to say that Hart had the money and would handle the
sale.  Both Hart and O'Brien requested that the deal take place
in the motel room, but Richards declined.  (Mot. Hr'g Tr. 9-10,
Jan. 4, 2010.)  Hart got into Richards' truck, but negotiations
soured after Richards refused to drive away from the motel
parking lot to another location.  Irate, Hart pulled a gun,
pointed it at Richards' head, and attempted an armed robbery.  To
distract Hart, Richards threw the pills at him and sped away.

Police officers pursued Hart into Room 74 where they found
Lee, O'Brien, and Ronald Cairnie, arresting all three.  The motel
room was small and untidy; a holster was in plain view and
needles were on the floor.  After the police read Cairnie his
Miranda warnings, he confessed that the Audi was his, consented
to a search of the car, and claimed that he sold the car earlier
that day to someone named "Alex."  He did not know his last name
or possess paperwork.  At some point, the police discovered
Cairnie was the registered owner of the green Audi.  Although it
is unclear whether the police knew that information before or
after the arrest, the police knew it before seeking the search
warrant.  At the motel management's request, the Audi was towed

2

to the police station.  During booking, the police found approximately $2,100.00 in cash in Cairnie's possession, folded and secured by a rubber band.

At the police station, the police interviewed Lee, who explained: (1) Cairnie is Hart's nephew and is from Maine; (2) he was pretty sure Cairnie was either the buyer or wanted to be the buyer of the pills; (3) Cairnie had supplied part of the money Hart tried to use to pay for the pills; and (4) Cairnie often buys pills in Massachusetts and sells them for a higher price in Maine.  (Gov't Ex. 1 at 6, ¶ 13.)  Lee also told the police that he and Cairnie had talked at the police station, and that Cairnie admitted having two hundred Oxycodone pills hidden in the Audi. According to Lee, Cairnie said he had paid $38 for each eighty milligram pill, and that Cairnie had given the police permission to search his car because he did not think the police would find the pills.  (Id. ¶ 14.)

The Peabody Police included Lee's statements in the affidavit Richards submitted to secure a search warrant for Cairnie's car.  (See id. at 4-8.)  During the search, police discovered 193 Oxycodone pills and a digital scale with powder residue on it.  (Id. at 3.)

### III.  DISCUSSION

**A.  <u>Probable Cause for Arrest</u>**

"It is common ground that a warrantless arrest must be based on probable cause." <u>United States v. Brown</u>, 500 F.3d 48, 56 (1st Cir. 2007) (citations omitted); <u>see also</u> <u>United States v. Watson</u>, 423 U.S. 411, 417-18 (1976).  Probable cause for an arrest "'exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators.'" <u>Brown</u>, 500 F.3d at 56 (quoting <u>Acosta v. Ames Dep't Stores, Inc.</u>, 386 F.3d 5, 9 (1st Cir. 2004)); <u>see also</u> <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964). Courts examine the "totality of the circumstances" when determining whether an arrest is supported by probable cause. <u>United States v. Torres-Maldonado</u>, 14 F.3d 95, 105 (1st Cir. 1994) (quoting <u>United States v. Uricoechea-Casallas</u>, 946 F.2d 162, 165 (1st Cir. 1991)).

Defendant argues that the police lacked probable cause to arrest him even though he was in a motel room with men involved in the drug deal.  Courts have considered propinquity a factor in finding probable cause.  <u>See, e.g.</u>, <u>United States v. Reyes</u>, 225 F.3d 71, 75-76 (1st. Cir. 2000) (stating that while an "association might not alone give rise to probable cause, the officers were plainly reasonable in considering it").  "[A]

4

person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Ybarra v. Illinois, 444 U.S. 85, 91 (1979) (holding association insufficient to support probable cause where the defendant's association with the illegal activity was tenuous because the police had a warrant to search a bar and the bartender, but arrested the defendant simply because he was a patron). Propinquity must indicate more than a "momentary, casual, or random association." United States v. Martinez-Molina, 64 F.3d 719, 729 (1st Cir. 1995). "In assessing the significance of a defendant's association to others independently suspected of criminal activity," the First Circuit examined "whether the known criminal activity was contemporaneous with the association and whether the circumstances suggest that the criminal activity could have been carried on without the knowledge of all persons present." Id. at 727 (citing United States v. Hillison, 733 F.2d 692, 697 (9th Cir. 1984)).

In the instant case, the focus of the drug deal was Room 74 at the Carriage House Motel. Cairnie was in the small motel room with the three men engaged directly in the drug deal. O'Brien and Hart both urged Richards to enter Room 74 to consummate the drug deal, and became irate when he refused. The motel room door was wide open, suggesting that the inhabitants had an interest in the activities occurring outside. Police discovered Cairnie in Room 74 along with drug paraphernalia and an empty holster lying

in plain view.  These circumstances make it likely that Cairnie
was a participant in the drug transaction, and, as such, there
was probable cause to arrest him.

**B.**   **Post-Arrest Statements**

Even if there were no probable cause to arrest, the
government argues that Lee's post-arrest statements to the police
were sufficient to provide probable cause to search the Audi.
The defendant argues that all statements made by a defendant to
any individual must be suppressed if they are the result of an
illegal stop.  See United States v. Chanthasouxat, 342 F.3d 1271,
1281 (11th Cir. 2003) (suppressing statements defendant made to
co-defendant in the back of a police car because the stop was
illegal as fruit of the poisonous tree).

The Supreme Court has held that not all evidence obtained
illegally is 'fruit of the poisonous tree' if it is "sufficiently
distinguishable to be purged of the primary taint."  Wong Sun v.
United States, 371 U.S. 471, 488 (1963) (internal quotations
omitted).  In United States v. Houle, 620 F.2d 164, 165 (8th Cir.
1980) (per curiam), the court affirmed a ruling admitting
incriminating statements made by the defendant to a cellmate
approximately two hours after his unlawful arrest.  The Houle
court analyzed the defendant's statements under Brown v.
Illinois, 422 U.S. 590, 602 (1975), holding "that in order for
the causal chain between the illegal arrest and a subsequent

6

statement to be broken, <u>Wong Sun</u> . . . requires that the statement not only meet Fifth Amendment standards of voluntariness, but that the statement be 'sufficiently an act of free will to purge the primary taint' for Fourth Amendment purposes."  <u>Houle</u>, 620 F.2d at 165-66 (quoting <u>Brown</u>, 422 U.S. at 602).  Because his "statements were not prompted by coercion or interrogation and were voluntarily made under circumstances within Houle's control; . . . they were sufficiently an act of free will to purge the primary taint of the illegal arrest, and thus were properly admitted."  <u>Id.</u> at 166.

The Court need not determine whether Cairnie's statements to Lee are admissible because there is probable cause to issue a search warrant even if the challenged statements are excised.

> [T]he Supreme Court held that, if an affiant knowingly includes a false statement in a warrant affidavit, the warrant will stand if, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause."

<u>United States v. Veillette</u>, 778 F.2d 899, 904 (1st Cir. 1985) (quoting <u>Franks v. Delaware</u>, 438 U.S. 154, 171-172 (1978)).

Richards' affidavit distinguishes clearly between statements by Lee based on knowledge obtained prior to the arrest and information that Cairnie communicated to Lee after the arrest. There are three post-arrest statements that Cairnie made to Lee that arguably would be set aside if the arrest was unlawful: (1) that Cairnie had 200 Oxycodone pills hidden in the Audi; (2) that

Cairnie had given the police permission to search the car because he did not think they could find them; and (3) that Cairnie said he paid $38.00 a piece for the 80mg Oxycodone or $3,800.00 for a hundred pack.

Even if these statements were excised, the remaining information obtained from Lee is sufficient to support a finding of probable cause to search the car for drug paraphernalia and other evidence of drug trafficking.  Lee informed the police of the following: (1) Cairnie was Hart's nephew and is from Maine; (2) he was pretty sure that Cairnie was either the buyer for the pills or wanted to be the buyer of the pills; (3) part of the money Hart had to pay for the pills was Cairnie's and that he had done this many times; and (4) Cairnie buys pills at a cheap price in Massachusetts and sells them in Maine, possibly Portland, for $80.00 a piece.  (Gov't Ex. 1 at 6, ¶ 13.)  In addition to Lee's statements, the warrant affidavit describes that the drug conspiracy revolved around Room 74, in which Cairnie was arrested and in front of which his car was parked.  In considering the warrant affidavit with the three post-arrest statements by Cairnie set aside, the Court may find sufficient information to support a finding of probable cause.

## IV.   CONCLUSION

The motion to suppress [Docket No. 59] is **<u>DENIED</u>**.

/s/ Patti B. Saris

_____
PATTI B. SARIS
United States District Judge